Westlaw.

Slip Copy                                                                Page 1

Slip Copy, 2005 WL 1353336 (D.Del.)
**(Cite as: Slip Copy)**

H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Kevin D. MILLER, Plaintiff,
v.
Rafael WILLIAMS, Phillip Thomas, Nurse Jackie,
Stan Taylor, Corporal Brown, John Doe 1, John
Doe 2, John Doe 3, First Correctional Medical,
Diane Hernandez, Doctor Corkin, Doctor Shah,
Doctor Allie Sittie, and Doctor Roach,
**No. Civ.A. 03-913-KAJ.**

June 7, 2005.

Kevin D. Miller, Smyrna, DE, pro se.
Daniel L. McKenty, McCullough & McKenty, P.A.,
Wilmington, DE, for Rafael Williams, et al.
JORDAN, J.

### I. INTRODUCTION

**\*1** Before me is a Motion to Dismiss ("Docket item
["D.I."] 34; the "Motion") filed by defendants
Raphael Williams, Stan Taylor, and Phillip Thomas
(collectively, the "Moving Defendants"). Also
before me is a Motion for Appointment of Counsel
filed by plaintiff Kevin D. Miller ("Plaintiff").
(D.I.10.) For the reasons that follow, the Motion to
Dismiss will be granted and Plaintiff's motion will
be denied as moot.

### II. BACKGROUND [FN1]

> FN1. The following rendition of
> background information is cast in the light
> most favorable to the non-moving party
> and does not constitute findings of fact.

Plaintiff is a *pro se* litigant incarcerated at the
Delaware Correctional Center ("DCC") in Smyrna,

Delaware. (D.I. 35 at 1.) [FN2] On September 26,
2003, Plaintiff commenced this action by filing a
Complaint pursuant to the 42 U.S.C. § 1983,
alleging that the State of Delaware Department of
Corrections ("DDC"), several prison officials and
correctional officers at Gander Hill, and certain
First Correctional Medical ("FCM") employees
violated Plaintiff's Eighth Amendment right to be
free from cruel and unusual punishment.[FN3] (D.I.
37 at 4-5, 7.) Specifically, Plaintiff alleges that
defendants acted with negligence and deliberate
indifference toward "the conditions under which his
injury [to his back] was sustained," "his injuries at
the scene of the accident," and his "serious medical
needs" that developed as a result. (D.I. 37 at 7-8.)

> FN2. At the time he filed this complaint,
> Plaintiff was incarcerated at the Howard R.
> Young Correctional Institution ("Gander
> Hill") in Wilmington, Delaware. (D.I. 35
> at 1.)

> FN3. FCM was the contract medical
> provider at DDC.

On October 16, 2002, Plaintiff was "handcuffed and
shackled" and ordered onto a "transportation van"
headed for court. (D.I. 2, Attachment ("Attach.") 1
at 1.) While boarding the van, Plaintiff allegedly
slipped and fell from the upper step of the van onto
the concrete floor of the garage. (*Id.*) Plaintiff
claims he suffered injuries to his "back, tailbone,
neck and arm." (*Id.*) Plaintiff asserts that he fell
because the floor and steps of the van were wet and
he was not given the required "physical escort." (*Id.*
) After Plaintiff fell, he lay on the ground and
informed the transportation officer, defendant
Thomas, that he could not get up and needed a
doctor. (*Id.*) Subsequently, four or five officers and
"a nurse named Jackie" ("Nurse Jackie") arrived at
the scene in response to Plaintiff's request for
medical help. (*Id.* at 2.) Nurse Jackie asked Plaintiff
to get up, but he informed her that he could not get

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1353336 (D.Del.)
**(Cite as: Slip Copy)**

up and again requested to see a doctor. (*Id.*) Despite his requests not to be moved, the officers allegedly picked Plaintiff up by his arms, placed him on his feet, and "forced [him] to limp to the infirmary." (*Id.*) At the infirmary, Diane Hernandez ("Hernandez"), a physician's assistant, diagnosed Plaintiff with a "contusion" and "muscle sprain to the back areas and arm [,]" and she "prescribed muscle relaxers ' Robaxin' and Motrin, for the pain." (*Id.* at 2-3.)

More than a week later, Plaintiff was taken to the Medical Department because he was still experiencing pain in his neck and back. (*Id.* at 3.) He was examined by a nurse who was unable to prescribe medication for his pain but scheduled an appointment for him to see a doctor on October 30. (*Id.*) Plaintiff was not taken to the infirmary until November 4, when he again saw Hernandez, who prescribed "Naproxen" for the "pain and spasms." (*Id.*) Plaintiff was again scheduled for a follow-up appointment on November 8, but was not taken to the infirmary until November 18. (*Id.*) On that date, Plaintiff was again examined by Hernandez, who informed him that there was nothing more she could do for his pain but that she would schedule an appointment for him to see a doctor. (*Id.*) Two days later Plaintiff saw Dr. Roach, who prescribed muscle relaxers and ordered an X-ray of Plaintiff's back. (*Id.* at 4.) Plaintiff requested an MRI, but Dr. Roach allegedly denied his request because it " would cost too much money." (*Id.*) Two days after his appointment with Dr. Roach, on November 22, Plaintiff had an X-ray of his lower back. (*Id.* at 4-5.)

**\*2** On November 30, Plaintiff filed a "sick cell slip" because he was still experiencing back pain and was now having headaches as well. (*Id.* at 5.) On December 8, Plaintiff filed a medical grievance because his sick cell slip had not been answered, and he had not been called for his 10 day check-up with Dr. Roach. (*Id.*) On December 18, Plaintiff again saw Dr. Roach, who reported that the X-ray revealed no broken bones but that he would continue his medication for the pain. (*Id.*) Five days later, Plaintiff filed another sick cell slip because he felt a "strong, sharp, pain" in his "lower back, ... hips ... [and] buttocks area" when he walked and at night when he slept. (*Id.* at 5-6.) According to Plaintiff, he continued to file numerous sick cell

slips but was never called to the infirmary until it was time for his physical on January 4, 2003. (*Id.* at 6.) During his physical, Hernandez prescribed medication for Plaintiff's pain and scheduled an appointment for him to see a doctor on February 25. (*Id.*) On February 25, Plaintiff saw Dr. Shah, who informed him that there was nothing more that could be done for him because his X-ray was negative. (*Id.*) The next day, Plaintiff had his medical grievance hearing before a board which, according to Plaintiff, consisted of members from the "Delaware Department of Justice" and "Health Service Administrators." (*Id.*) The board held that the most appropriate course of treatment for Plaintiff's injury was "Tylenol or Motrin and exercise." (*Id.*) Plaintiff appealed the decision, but his appeal was denied. (*Id.*)

Plaintiff says he continued to experience pain, and, on April 28, he was taken to the infirmary and seen by a nurse who referred him to either a doctor or a physician's assistant. (*Id.*) On May 6, Plaintiff again saw Hernandez, who informed Plaintiff that there was nothing more that could be done for him, unless he was "unable to move." (*Id.*) Plaintiff informed her that he was "unable to move when [his] hips [had] sharp shooting pains." (*Id.*) In response to Plaintiff's claim that he was unable to move, Hernandez scheduled another appointment for him to see a doctor. (*Id.*)

On June 5, Plaintiff saw Dr. Sattie who examined him and informed him that there was nothing more that could be done for him. (*Id.* at 7.) "That same night," Plaintiff filed a sick cell slip because he felt sharp pains and "could not move or breathe comfortably." (*Id.*) On June 11, Plaintiff met with the medical administrator. who explained to him that there was nothing more anyone could do for him except continue to give him "Motrin or Tylenol. " (*Id.*) On July 9, Plaintiff was examined by Dr. Corking, who offered to prescribe him more medication for the pain, but warned him that extended use of such medicines could cause liver damage. (*Id.*) Dr. Corking allegedly warned Plaintiff that his back pains may get worse in the future and he would request an MRI, but doubted it would be approved since Plaintiff's X-rays were negative. (*Id.*)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 3

Slip Copy, 2005 WL 1353336 (D.Del.)
**(Cite as: Slip Copy)**

*3 Less than a week later, Plaintiff returned to the infirmary and was examined by Dr. Shah. (*Id.*) According to Plaintiff, Dr. Shah acted " unprofessionally," so he filed a medical grievance. ( *Id.* at 7.) Plaintiff informed the medical administrator that Dr. Shah's conduct was unprofessional. (*Id.* at 7-8.) The medical administrator told Plaintiff that she would speak with Dr. Shah. (*Id.* at 8.) The medical administrator prescribed him medication for his pain and recommended that he stretch and do exercises. (*Id.*)

On July 9, when Plaintiff's request for an MRI was denied, he filed another medical grievance. (*Id.* at 8.) By August 13, neither "the Warden [nor] medical personnel" had responded to Plaintiff's last two grievances, so he resubmitted them along with a letter to the Warden "pertaining to [his] medical grievances going unanswered." (*Id.*) A week later, Plaintiff received a response from the grievance chair that "both medical grievances [were] non-grievable and therefore denied." (*Id.*) Plaintiff subsequently filed this suit against Defendants. (D.I.2.)

### III. STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the factual allegations contained in the complaint must be accepted as true. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam). A pro se complaint can only be dismissed for failure to state a claim if it appears "beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[FN4]

> FN4. The Moving Defendants argue that because Plaintiff's Response to the Motion to Dismiss includes matters outside the pleading, including "letters requesting assistance at the highest levels of Young Correctional Institute" and " letters/affidavits from other inmates," their Motion to dimiss should be treated as one

for summary judgment. In making my decision, however, I have not considered matters outside the pleading and have thus chosen to treat the Motion as one to dismiss.

### IV. DISCUSSION

Plaintiff alleges that the defendants acted negligently and with deliberate indifference to his safety in violation of his Eighth Amendment rights when he was "fully handcuffed and shackled ... and forced ... to step up-on the transportation van steps" without the help of a physical escort. (D.I. 37 at 2-5.) A practice that limits or restricts prison inmates' constitutional rights may be necessary to "ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Bell v. Wolfish,* 441 U.S. 520, 545-47, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). A policy or practice that "impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). If the regulation is valid, the reviewing court should defer to the expertise of prison officials when deciding whether a particular policy or practice is necessary to "preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547.

The Moving Defendants contend that, "given the severity of the charges against these inmates, [i.e.] murder rape and escape," the transportation procedures are necessary to ensure the safety of " the officers, inmates ... and [the] general public." (D.I. 35 at 3.) Other than to help "elderly and medically infirmed inmates," prison officials are required to keep a reasonably safe distance between themselves and the inmates. (*Id.*) This is to reduce " the risk of serious harm and/or death in the event an inmate attempts to seize one of the officer's weapons." [FN5] (*Id.*)

> FN5. Plaintiff contends that officers " routinely assist 'fully handcuffed and shackled' inmates in and out of the van." (D.I. 37 at 4.) He also asserts that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4

Slip Copy, 2005 WL 1353336 (D.Del.)
**(Cite as: Slip Copy)**

officers "are not routinely armed with weapons at their side" because "more often than not" the officers weapons are "stored in the front compartment of the transportation van." (*Id.*)

*4 Because the safety of inmates and officers is a legitimate penological interest, the transportation procedures are valid.[FN6] Therefore, I defer to the expertise of the prison officials. Thus, the Moving Defendants' Motion to Dismiss will be granted with respect to Plaintiff's claims that the failure to physically escort handcuffed and shackled inmates while boarding a van constitutes cruel and unusual punishment under the Eighth Amendment.

FN6. In addressing the relationship of the transportation issues to penological interests, I do not imply that any of the Plaintiff's constitutional rights were impinged.

Plaintiff also alleges that he received "improper and inadequate medical care" for his back injury because defendants were deliberately indifferent to his medical needs, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (D.I. 37 at 5-7.) In order to establish a claim under § 1983 based on lack of adequate medical care, a prisoner must allege facts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Allegations of medical malpractice do not state a claim under § 1983, because mere negligence does not amount to a violation of the Constitution, and a constitutional violation is required to establish a § 1983 claim. *Id.* at 106.

After Plaintiff's accident on October 16, 2002, a member of the medical staff arrived on the scene to assist with his getting to the infirmary. (D.I. 2, Attach. 1 at 2.) Over the following several months, Plaintiff was seen by medical personnel on numerous occasions to receive treatment for his injuries. (*Id.* at 2-8.) After taking and examining an X-ray on Plaintiff's lower back, doctors eventually

diagnosed him with "back spasms" and treated him with pain medication, muscle relaxers, and suggested exercise. (*Id.;* D.I. 37 at 7.) Plaintiff contends that different measures should have been taken both at the scene of the accident and during his course of treatment. (D.I. 37 at 5.) Plaintiff suggests that "proper procedure at the scene of the injury would have been to provide a stretcher, guerney [sic], and immobilization brace for the head and neck." (*Id.* at 8.) He also contends that an MRI of his back was necessary to lead to a proper diagnosis of his condition. (*Id.* at 6.)

The Supreme Court has held that complaints based on the negligent diagnosis or treatment of a medical condition, such as "a decision not to order an X-ray, or like measures," are "matter[s] for medical judgment," and thus do not amount to cruel and unusual punishment under the Eighth Amendment. *Estelle,* 429 U.S. at 106-07. These claims rest on decisions with respect to his medical care, but Plaintiff has failed to plead facts which would support allegations that defendants were deliberately indifferent to his medical needs.

### IV. CONCLUSION

Accordingly, the Motion to Dismiss (D.I.34) will be granted and Plaintiff's motion for appointment of counsel (D.I.10) will be denied as moot.

D.Del.,2005.
Miller v. Williams
Slip Copy, 2005 WL 1353336 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00913 (Docket) (Sep. 29, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.