**MEMORANDUM OF AGREEMENT BETWEEN THE UNITED STATES
DEPARTMENT OF JUSTICE AND THE STATE OF DELAWARE REGARDING THE
DELORES J. BAYLOR WOMEN'S CORRECTIONAL INSTITUTION, THE
DELAWARE CORRECTIONAL CENTER, THE HOWARD R. YOUNG
CORRECTIONAL INSTITUTION, AND THE SUSSEX CORRECTIONAL
INSTITUTION**

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| II. | DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . | 4 |
| III. | MEDICAL AND MENTAL HEALTH CARE . . . . . . . . . . . . . . . . . . . . | 6 |
| IV. | SUICIDE PREVENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
| V. | QUALITY ASSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| VI. | IMPLEMENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| VII. | MONITORING, ENFORCEMENT, AND TERMINATION . . . . . . . . . | 18 |

## I.  INTRODUCTION

A.  On March 7, 2006, the United States Department of Justice ("DOJ"), notified the State of Delaware ("the State") of DOJ's intent to investigate the adequacy of medical and mental health care services in five facilities operated by the State's Department of Correction pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 to determine whether those services violated inmates' constitutional rights.  The facilities investigated were:

1. Delores J. Baylor Women's Correctional Institution ("Baylor");

2. Howard R. Young Correctional Institution, ("Howard Young");

3. John L. Webb Correctional Facility ("Webb");

4. Delaware Correctional Center ("DCC"); and

5. Sussex Correctional Institution ("Sussex").

B.  DOJ staff toured the five facilities on June 22, 2006, July 17-19, 2006 and August 14-16, 2006.  In addition, DOJ staff, accompanied by consultants in medical health care, mental health care and suicide prevention, toured Howard Young on October 4-6, 2006, Baylor and Webb on October 23-25, 2006 and Baylor again on November 15-17, 2006.

C.  On December 29, 2006, the DOJ issued a findings letter pursuant to 42 U.S.C. § 1997b(a)(1) which alleged that certain conditions at Baylor, DCC, Howard Young, and Sussex violated the constitutional rights of Delaware inmates.  It is the position of the DOJ that deficiencies in medical care, mental health care and suicide prevention at these four facilities [collectively referred to herein as "the Facilities"; see Definitions, paragraph A] were inconsistent with constitutional standards of care.  The DOJ made no findings with respect to Webb.

D.  Before the investigation began, the State had initiated its own efforts to improve conditions at the Facilities.  During the investigation, the State also commissioned an extensive internal review of the Facilities with the assistance of medical, mental health, and legal consultants, the detailed results of which they subsequently shared with DOJ and DOJ's consultants.  Throughout the course of the investigation, the State of Delaware and the staff at each Facility cooperated thoroughly and indicated a willingness to proactively and voluntarily undertake measures to improve conditions throughout the system.  Consequently, the Parties enter into this Memorandum of Agreement ("Agreement") for the purpose of utilizing their resources in support of improving medical and mental health care at the Facilities, rather than allocating such resources to the risks and burdens of litigation.

3

E.    The Parties to this Agreement do not intend to create in any non-party the status
      of third party beneficiary. This Agreement shall not be construed so as to create a
      private right of action to any non-party against the State or the United States. The
      rights, duties and obligations contained in this Agreement shall bind only the
      Parties to this Agreement.

F.    In entering into this Agreement, the State does not admit any violations of the
      constitutional rights of inmates confined at the Facilities nor does it admit any
      violation of state or federal law. This Agreement may not be used as evidence of
      liability in any other legal proceeding. However, the State remains firmly
      committed to improving medical and mental health care at the Facilities.

G.    The Parties acknowledge that Correctional Medical Services ("CMS") currently
      provides medical and mental health care to inmates at the Facilities and that such
      care is provided pursuant to a contract with CMS that sets forth the terms and
      conditions of the relationship between the State and CMS. The State shall be
      responsible for ensuring that CMS (or any successor contractor) complies with
      the terms of this Agreement. Nothing in this paragraph shall abrogate the State's
      responsibility to comply fully with the terms of this Agreement.

H.    It is expressly understood and acknowledged that, while this Agreement makes no
      distinctions between those issues concerning inmate medical and mental health
      care that were previously modified and improved prior to the issuance of the
      findings letter and those that shall be modified and/or improved by virtue of the
      terms of this Agreement, the Parties acknowledge that a number of the policies
      and/or procedures which this Agreement addresses were implemented or in the
      process of being implemented prior to the issuance of the findings letter.

## II. DEFINITIONS

In this Agreement, the following definitions apply:

A.    "The Facilities" means Baylor, DCC, Howard Young, and Sussex, collectively, as
      well as any facility that is built to replace or supplement any one of them.

B.    "Effective date" means the date the Agreement is executed by the Parties.

C.    "Generally accepted professional standards" means those industry standards
      accepted by a significant majority of professionals in the relevant field, and
      reflected in the standards of care such as those published by the National
      Commission on Correctional Health Care (NCCHC) . DOJ acknowledges that
      NCCHC has established different standards for jail and prison populations, and
      that the relevant standard that applies under this Agreement may differ for pre-
      trial and sentenced inmates. As used in this Agreement, the terms "adequate,"
      "appropriate," and "sufficient" refer to standards established by clinical

4

guidelines in the relevant field. The Parties shall consider clinical guidelines promulgated by professional organizations in assessing whether generally accepted professional standards have been met.

D.  "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

E.  "Inmates" means individuals sentenced to, incarcerated in, detained at, or otherwise confined at any of the Facilities.

F.  "Inmates with special needs" means inmates who are identified as suicidal, mentally ill, developmentally disabled, seriously or chronically ill, who are physically disabled, who have trouble performing activities of daily living, or who are a danger to themselves.

G.  "Isolation" means the placement of an inmate alone in a locked room or cell, except that it does not refer to adults single celled in general population.

H.  "Juveniles" means individuals detained at a facility who are under the age of eighteen (18).

I.  "Medical staff" means medical professionals, nursing staff, and certified medical assistants.

J.  "Medical professional" means a licensed physician, licensed physician assistant, or a licensed nurse practitioner providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services he or she has undertaken to provide.

K.  "Mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, psychiatric social work, activity therapy, recreational therapy or psychiatric nursing, currently licensed to the extent required by the State of Delaware to deliver those mental health services he or she has undertaken to provide.

L.  "Monitor" as used in this Agreement means the Monitor established by Section VII of this Agreement, and all persons or entities associated by the Monitor to assist in performing the monitoring tasks.

M.  "Nursing staff" means registered nurses, licensed practical nurses, and licensed vocational nurses providing services at a facility and currently licensed to the extent required by the State of Delaware to deliver those health services they have undertaken to provide.

5

N.    "The Parties" means the State and the DOJ.

O.    "Security staff" means all employees, irrespective of job title, whose regular duties include the supervision of inmates at the Facilities.

P.    "The State" means officials of the State of Delaware, including officials of the Department of Correction and its Bureau of Prisons, and their successors, contractors and agents.

Q.    "Train," when the term is used in remedial provisions of this Agreement, means to adequately instruct in the skills addressed, including assessment of mastery of instructional material.

## III.    MEDICAL AND MENTAL HEALTH CARE

### GENERAL PROVISIONS

(1)    Standard  The State shall ensure that services to address the serious medical and mental health needs of all inmates meet generally accepted professional standards.

(2)    Policies and Procedures  The State shall develop and revise its policies and procedures including those involving intake, communicable disease screening, sick call, chronic disease management, acute care, infection control, infirmary care, and dental care to ensure that staff provide adequate ongoing care to inmates determined to need such care. Medical and mental health policies and procedures shall be readily available to relevant staff.

(3)    Record keeping  The State shall develop and implement a unitary record-keeping system to ensure adequate and timely documentation of assessments and treatment and adequate and timely access by medical and mental health care staff to documents that are relevant to the care and treatment of inmates. A unitary-record-keeping system consists of a system in which all clinically appropriate documents for the inmate's treatment are readily available to each clinician. The State shall maintain a unified medical and mental health file for each inmate and all medical records, including laboratory reports, shall be timely filed in the medical file. The medical records unit shall be adequately staffed to prevent significant lags in filing records in an inmate's medical record. The State shall maintain the medical records such that persons providing medical or mental health treatment may gain access to the record as needed. The medical record should be complete, and should include information from prior incarcerations. The State shall implement an adequate system for medical records management.

(4)    Medication and Laboratory Orders  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure timely responses to orders for medications and laboratory tests. Such policies,

6

procedures, and practices shall be periodically evaluated to ensure that delays in inmates' timely receipt of medications and laboratory tests are prevented.

## Staffing and Training

(5)     Job Descriptions and Licensure   The State shall ensure that all persons providing medical or mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure. The State shall establish a credentialing program that meets generally accepted professional standards, such as those required for accreditation by the National Committee for Quality Assurance.

(6)     Staffing   The State shall maintain sufficient staffing levels of qualified medical staff and mental health professionals to provide care for inmates' serious medical and mental health needs that meets generally accepted professional standards.

(7)     Medical and Mental Health Staff Management   The State shall ensure that a full-time medical director is responsible for the management of the medical program. The State shall also provide a director of nursing and adequate administrative medical and mental health management. In addition, the State shall ensure that a designated clinical director shall supervise inmates' mental health treatment at the Facilities. These positions may be filled either by State employees, by independent contractors retained by the State, or pursuant to the State's contract with a correctional health care vendor.

(8)     Medical and Mental Health Staff Training   The State shall continue to ensure that all medical staff and mental health professionals are adequately trained to meet the serious medical and mental health needs of inmates. All such staff shall continue to receive documented orientation and in-service training in accordance with their job classifications, and training topics shall include suicide prevention and the identification and care of inmates with mental disorders.

(9)     Security Staff Training   The State shall ensure that security staff are adequately trained in the identification, timely referral, and proper supervision of inmates with serious medical or mental health needs. The State shall ensure that security staff assigned to mental health units receive additional training related to the proper supervision of inmates suffering from mental illness.

## Screening and Treatment

(10)    Medical Screening   The State shall ensure that all inmates receive an appropriate and timely medical screening by a medical staff member upon arrival at a facility. The State shall ensure that such screening enables staff to identify individuals with serious medical or mental health conditions, including acute medical needs, infectious diseases, chronic conditions, physical disabilities, mental illness, suicide risk, and drug and/or alcohol

7

withdrawal.  Separate mental health screening shall be provided as described in
Paragraph 34.

(11)  Privacy  The State shall make reasonable efforts to ensure inmate privacy when
conducting medical and mental health screening, assessments, and treatment.  However,
maintaining inmate privacy shall be subject to legitimate security concerns and
emergency situations.

(12)  Health Assessments  The State shall ensure that all inmates receive timely medical and
mental health assessments.  Upon intake, the State shall ensure that a medical
professional identifies those persons who have chronic illness. Those persons with
chronic illness shall receive a full health assessment between one (1) and seven (7) days
of intake, depending on their physical condition.  Persons without chronic illness should
receive full health assessment within fourteen (14) days of intake.  The State will ensure
that inmates with chronic illnesses will be tracked in a standardized fashion.  A re-
admitted inmate or an inmate transferred from another facility who has received a
documented full health assessment within the previous twelve (12) months, and whose
receiving screening shows no change in health status, need not receive a new full medical
and mental health assessment.  For such inmates, medical staff and mental health
professionals shall review prior records and update tests and examinations as needed.

(13)  Referrals for Specialty Care  The State shall ensure that:  a) inmates whose serious
medical or mental health needs exceed the services available at their facility shall be
referred in a timely manner to appropriate medical or mental health care professionals;
b) the findings and recommendations of such professionals are tracked and documented
in inmates' medical files; and c) treatment recommendations are followed as clinically
indicated.

(14)  Treatment or Accommodation Plans  Inmates with special needs shall have special needs
plans.  For inmates with special needs who have been at the facility for thirty (30) days,
this shall include appropriate discharge planning.  The DOJ acknowledges that for
sentenced inmates with special needs, such discharge planning shall be developed in
relation to the anticipated date of release.

(15)  Drug and Alcohol Withdrawal  The State shall develop and implement appropriate
written policies, protocols, and practices, consistent with standards of appropriate
medical care, to identify, monitor, and treat inmates at risk for, or who are experiencing,
drug or alcohol withdrawal.  The State shall implement appropriate withdrawal and
detoxification programs.  Methadone maintenance programs shall be offered for
pregnant inmates who were addicted to opiates and/or participating in a legitimate
methadone maintenance program when they entered the Facilities.

8

(16) Pregnant Inmates The State shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

(17) Communicable and Infectious Disease Management The State shall adequately maintain statistical information regarding contagious disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

(18) Clinic Space and Equipment The State shall ensure that all face-to-face nursing and physician examinations occur in settings that provide appropriate privacy and permit a proper clinical evaluation including an adequately-sized examination room that contains an examination table, an operable sink for hand-washing, adequate lighting, and adequate equipment, including an adequate microscope for diagnostic evaluations. The State shall submit a comprehensive action plan as described in Paragraph 65 of this Agreement identifying the specific measures the State intends to take in order to bring the Facilities into compliance with this paragraph.

## Access to Care

(19) Access to Medical and Mental Health Services The State shall ensure that all inmates have adequate opportunity to request and receive medical and mental health care. Appropriate medical staff shall screen all written requests for medical and/or mental health care within twenty-four (24) hours of submission, and see patients within the next 72 hours, or sooner if medically appropriate. The State shall maintain sufficient security staff to ensure that inmates requiring treatment are escorted in a timely manner to treatment areas. The State shall develop and implement a sick call policy and procedure which includes an explanation of the order in which to schedule patients, a procedure for scheduling patients, where patients should be treated, the requirements for clinical evaluations, and the maintenance of a sick call log. Treatment of inmates in response to a sick call slip should occur in a clinical setting.

(20) Isolation Rounds The State shall ensure that medical staff make daily sick call rounds in the isolation areas, and that nursing staff make rounds at least three times a week, to give inmates in isolation adequate opportunities to contact and discuss health and mental health concerns with medical staff and mental health professionals in a setting that affords as much privacy as security will allow.

(21) Grievances The State shall develop and implement a system to ensure that medical grievances are processed and addressed in a timely manner. The State shall ensure that medical grievances and written responses thereto are included in inmates' files, and that grievances and their outcomes are logged, reviewed , and analyzed on a regular basis to identify systemic issues in need of redress. The State shall develop and implement a

9

procedure for discovering and addressing all systemic problems raised through the grievance system.

## Chronic Disease Care

(22)    <u>Chronic Disease Management Program</u>  The State shall develop and implement a written chronic care disease management program, consistent with generally accepted professional standards, which provides inmates suffering from chronic illnesses with appropriate diagnosis, treatment, monitoring, and continuity of care.  As part of this program, the State shall maintain a registry of inmates with chronic diseases.

(23)    <u>Immunizations</u>  The State shall make reasonable efforts to obtain immunization records for all juveniles who are detained at the Facilities for more than one (1) month.  The State shall ensure that medical staff update immunizations for such juveniles in accordance with nationally recognized guidelines and state school admission requirements.  The physicians who determine that the vaccination of a juvenile or adult inmate is medically inappropriate shall properly record such determination in the inmate's medical record.  The State shall develop policies and procedures to ensure that inmates for whom influenza, pneumonia and Hepatitis A and B vaccines are medically indicated are offered these vaccines.

## Medication

(24)    <u>Medication Administration</u>  The State shall ensure that all medications, including psychotropic medications, are prescribed appropriately and administered in a timely manner to adequately address the serious medical and mental health needs of inmates.  The State shall ensure that inmates who are prescribed medications for chronic illnesses that are not used on a routine schedule, including inhalers for the treatment of asthma, have access to those medications as medically appropriate.  The State shall develop and implement adequate policies and procedures for medication administration and adherence.  The State shall ensure that the prescribing practitioner is notified if a patient misses a medication dose on three consecutive days, and shall document that notice.  The State's formulary shall not unduly restrict medications.  The State shall review its medication administration policies and procedures and make any appropriate revisions.  The State shall ensure that medication administration records ("MARs") are appropriately completed and maintained in each inmate's medical record.

(25)    <u>Continuity of Medication</u>  The State shall ensure that arriving inmates who report that they have been prescribed medications shall receive the same or comparable medication as soon as is reasonably possible, unless a medical professional determines such medication is inconsistent with generally accepted professional standards.  If the inmate's reported medication is ordered discontinued or changed by a medical professional, a medical professional shall conduct a face-to-face evaluation of the inmate as medically appropriate.

10

(26)    Medication Management  The State shall develop and implement guidelines and controls regarding the access to, and storage of, medication as well as the safe and appropriate disposal of medication and medical waste.

## Emergency Care

(27)    Access to Emergency Care  The State shall train medical, mental health and security staff to recognize and respond appropriately to medical and mental health emergencies. Furthermore, the State shall ensure that inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.

(28)    First Responder Assistance  The State shall train all security staff to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in an emergency situation.  The State shall provide all security staff with the necessary protective gear, including masks and gloves, to provide first line emergency response.

## Mental Health Care

(29)    Treatment  The State shall ensure that qualified mental health professionals provide timely, adequate, and appropriate screening, assessment, evaluation, treatment and structured therapeutic activities to inmates requesting mental health services, inmates who become suicidal, and inmates who enter with serious mental health needs or develop serious mental health needs while incarcerated.

(30)    Psychiatrist Staffing  The State shall retain sufficient psychiatrists to enable the Facilities to address the serious mental health needs of all inmates with timely and appropriate mental health care consistent with generally accepted professional standards.  This shall include retaining appropriately licensed and qualified psychiatrists for a sufficient number of hours per week to see patients, prescribe and adequately monitor psychotropic medications, participate in the development of individualized treatment plans for inmates with serious mental health needs, review charts in the context of rendering appropriate mental health care, review and respond to the results of diagnostic and laboratory tests, and be familiar with and follow policies, procedures, and protocols.  The psychiatrist shall collaborate with the chief psychologist in mental health services management as well as clinical treatment, shall communicate problems and resource needs to the Warden and chief psychologist, and shall have medically appropriate autonomy for clinical decisions at the facility.  The psychiatrist shall supervise and oversee the treatment team.

(31)    Administration of Mental Health Medications  The State shall develop and implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that psychotropic medications are prescribed, distributed, and

11

monitored properly and safely and consistent with generally accepted professional standards. The State shall ensure that all psychotropic medications are administered by qualified medical professionals or other health care personnel qualified under Delaware state law to administer medications, who consistently implement adequate policies and procedures to monitor for adverse reactions and potential side effects and to adequately document the administration of such medications in the MARs. Documentation in the MARs shall include a clear and consistent indication of whether the inmate refused or otherwise missed any doses of medication, as well as doses consumed. As part of the quality assurance program set forth in Section V of this Agreement, a qualified medical professional or registered nurse supervisor shall review MARs on a regular and periodic basis to determine whether policies and procedures are being followed.

(32)     Mental Illness Training  The State shall conduct initial and periodic training for all security staff on how to recognize symptoms of mental illness and respond appropriately. Such training shall be conducted by a qualified mental health professional, registered psychiatric nurse, or other appropriately trained and qualified individual, and shall include instruction on how to recognize and respond to mental health emergencies.

(33)     Mental Health Screening  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted correctional mental health care standards to ensure that all inmates receive an adequate initial mental health screening by appropriately trained staff within twenty-four (24) hours after intake. Such screening shall include an individual private (consistent with security limitations) interview of each incoming inmate, including whether the inmate has a history of mental illness, is currently receiving or has received psychotropic medications, has attempted suicide, or has suicidal propensities. Documentation of the screening shall be maintained in the appropriate medical record. Inmates who have been on psychotropic medications prior to intake will be assessed by a psychiatrist as to the need to continue those medications, in a timely manner, no later than 7-10 days after intake or sooner if clinically appropriate. These inmates shall remain on previously prescribed psychotropic medications pending psychiatrist assessment. Incoming inmates who are in need of emergency mental health services shall receive such care immediately after intake. Incoming inmates who require resumption of psychotropic medications shall be seen by a psychiatrist as soon as clinically appropriate.

(34)     Mental Health Assessment and Referral  The State shall develop and implement adequate policies, procedures, and practices consistent with generally accepted professional standards to ensure timely and appropriate mental health assessments by qualified mental health professionals for those inmates whose mental health histories, or whose responses to initial screening questions, indicate a need for such an assessment. Such assessments shall occur within seventy-two (72) hours of the inmate's mental health screening or the identification of the need for such assessment, whichever is later. The State shall also ensure that inmates have access to a confidential self-referral system by which they may request mental health care without revealing the substance of their request to security

12

staff. Written requests for mental health services shall be forwarded to a qualified mental health professional and timely evaluated by him or her. The State shall ensure adequate and timely treatment for inmates whose assessments reveal serious mental illness, including timely and appropriate referrals for specialty care and regularly scheduled visits with qualified mental health professionals.

(35) Mental Health Treatment Plans The State shall ensure that a qualified mental health professional prepares in a timely manner and regularly updates an individual mental health treatment plan for each inmate who requires mental health services. The State shall also ensure that the plan is timely and consistently implemented. Implementation of and any changes to the plan shall be documented in the inmate's medical/mental health record.

(36) Crisis Services The State shall ensure an adequate array of crisis services to appropriately manage psychiatric emergencies. Crisis services shall not be limited to administrative/disciplinary isolation or observation status. Inmates shall have access to appropriate in-patient psychiatric care when clinically appropriate.

(37) Treatment for Seriously Mentally Ill Inmates The State shall ensure timely and appropriate therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate space for treatment, adequate staff to provide treatment, and an adequate array of therapeutic programming. The State shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, in accordance with generally accepted correctional mental health care standards.

(38) Review of Disciplinary Charges for Mental Illness Symptoms The State shall ensure that disciplinary charges against inmates with serious mental illness who are placed in Isolation are reviewed by a qualified mental health professional to determine the extent to which the charge may have been related to serious mental illness, and to determine whether an inmate's serious mental illness should be considered by the State as a mitigating factor when punishment is imposed on inmates with a serious mental illness.

(39) Procedures for Mentally Ill Inmates in Isolation or Observation Status The State shall implement policies, procedures, and practices consistent with generally accepted professional standards to ensure that all mentally ill inmates on the facility's mental health caseload and who are housed in Isolation receive timely and appropriate treatment, including completion and documentation of regular rounds in the Isolation units at least once per week by qualified mental health professionals in order to assess the serious mental health needs of those inmates. Inmates with serious mental illness who are placed in Isolation shall be evaluated by a qualified mental health professional within twenty-four hours and regularly thereafter to determine the inmate's mental health status, which shall include an assessment of the potential effect of the Isolation on the inmate's mental

13

health. During these regular evaluations, the State shall evaluate whether continued Isolation is appropriate for that inmate, considering the assessment of the qualified mental health professional, or whether the inmate would be appropriate for graduated alternatives. The State shall adequately document all admissions to, and discharges from, Isolation, including a review of treatment by a psychiatrist. The State shall provide adequate facilities for observation, with no more than two inmates per room.

(40)    Mental Health Services Logs and Documentation  The State shall ensure that the State maintains an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication(s) and dosages for inmates on psychotropic medications. In addition, inmate's files shall contain current and accurate information regarding any medication changes ordered in at least the past year.

## IV.    SUICIDE PREVENTION

(41)    Suicide Prevention Policy  The State shall review and, to the extent necessary, revise its suicide prevention policy to ensure that it includes the following provisions: 1) training; 2) intake screening/assessment; 3) communication; 4) housing; 5) observation; 6) intervention; and 7) mortality and morbidity review.

(42)    Suicide Prevention Training Curriculum  The State shall review and, to the extent necessary, revise its suicide prevention training curriculum, which shall include the following topics: 1) the suicide prevention policy as revised consistent with this Agreement; 2) why facility environments may contribute to suicidal behavior; 3) potential predisposing factors to suicide; 4) high risk suicide periods; 5) warning signs and symptoms of suicidal behavior; 6) case studies of recent suicides and serious suicide attempts; 7) mock demonstrations regarding the proper response to a suicide attempt; and 8) the proper use of emergency equipment.

(43)    Staff Training  Within twelve months of the effective date of this Agreement, the State shall ensure that all existing and newly hired correctional, medical, and mental health staff receive an initial eight-hour training on suicide prevention curriculum described above. Following completion of the initial training, the State shall ensure that a minimum of two hours of refresher training on the curriculum are completed by all correctional care, medical, and mental health staff each year.

(44)    Intake Screening/Assessment  The State shall develop and implement policies and procedures pertaining to intake screening in order to identify newly arrived inmates who may be at risk for suicide. The screening process shall include inquiry regarding: 1) past suicidal ideation and/or attempts; 2) current ideation, threat, plan; 3) prior mental health treatment/hospitalization; 4) recent significant loss (job, relationship, death of family

14

member/close friend, etc.); 5) history of suicidal behavior by family member/close friend; 6) suicide risk during prior confinement in a state facility; and 7) arresting/transporting officer(s) belief that the inmate is currently at risk.

(45) Mental Health Records Upon admission, the State shall immediately request all pertinent mental health records regarding the inmate's prior hospitalization, court-ordered evaluations, medication, and other treatment. DOJ acknowledges that the State's ability to obtain such records depends on the inmate's consent to the release of such records.

(46) Identification of Inmates at Risk of Suicide Inmates at risk for suicide shall be placed on suicide precautions until they can be assessed by qualified mental health personnel. Inmates at risk of suicide include those who are actively suicidal, either threatening or engaging in self-injurious behavior; inmates who are not actively suicidal, but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or have a recent prior history of self-destructive behavior; and inmates who deny suicidal ideation or do not threaten suicide, but demonstrate other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury.

(47) Suicide Risk Assessment The State shall ensure that a formalized suicide risk assessment by a qualified mental health professional is performed within an appropriate time not to exceed 24 hours of the initiation of suicide precautions. The assessment of suicide risk by qualified mental health professionals shall include, but not be limited to, the following: description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history, level of lethality; current medication and diagnosis; and recommendations/treatment plan. Findings from the assessment shall be documented on both the assessment form and health care record.

(48) Communication The State shall ensure that any staff member who places an inmate on suicide precautions shall document the initiation of the precautions, level of observation, housing location, and conditions of the precautions. The State shall develop and implement policies and procedures to ensure that the documentation described above is provided to mental health staff and that in-person contact is made with mental health staff to alert them of the placement of an inmate on suicide precautions. The State shall ensure that mental health staff thoroughly review an inmate's health care record for documentation of any prior suicidal behavior. The State shall promulgate a policy requiring mental health to utilize progress notes to document each interaction and/or assessment of a suicidal inmate. The decision to upgrade, downgrade, discharge, or maintain an inmate on suicide precautions shall be fully justified in each progress note. An inmate shall not be downgraded or discharged from suicide precautions until the responsible mental health staff has thoroughly reviewed the inmate's health care record, as well as conferred with correctional personnel regarding the inmate's stability. Multidisciplinary case management team meetings (to include facility officials and

15

available medical and mental health personnel) shall occur on a weekly basis to discuss
the status of inmates on suicide precautions.

(49)   Housing   The State shall ensure that all inmates placed on suicide precautions are housed
in suicide-resistant cells (i.e., cells without protrusions that would enable inmates to
hang themselves). The location of the cells shall provide full visibility to staff. At the
time of placement on suicide precautions, medical or mental health staff shall write
orders setting forth the conditions of the observation, including but not limited to
allowable clothing, property, and utensils, and orders addressing continuation of
privileges, such as showers, telephone, visiting, recreation, etc., commensurate with the
inmate's security level. Removal of an inmate's prison jumpsuit (excluding belts and
shoelaces) and the use of any restraints shall be avoided whenever possible, and used
only as a last resort when the inmate is engaging in self-destructive behavior. The Parties
recognize that security and mental health staff are working towards the common goal of
protecting inmates from self-injury and from harm inflicted by other inmates. Such
orders must therefore take into account all relevant security concerns, which can include
issues relating to the commingling of certain prison populations and the smuggling of
contraband. Mental health staff shall give due consideration to such factors when setting
forth the conditions of the observation, and any disputes over the privileges that are
appropriate shall be resolved by the Warden or his or her designee. Scheduled court
hearings shall not be cancelled because an inmate is on suicide precautions.

(50)   Observation   The State shall develop and implement policies and procedures pertaining
to observation of suicidal inmates, whereby an inmate who is not actively suicidal, but
expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or
plan) and/or has a recent prior history of self-destructive behavior, or an inmate who
denies suicidal ideation or does not threaten suicide, but demonstrates other concerning
behavior (through actions, current circumstances, or recent history) indicating the
potential for self-injury, shall be placed under close observation status and observed by
staff at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes). An
inmate who is actively suicidal, either threatening or engaging in self-injurious behavior,
shall be placed on constant observation status and observed by staff on a continuous,
uninterrupted basis. Mental health staff shall assess and interact with (not just observe)
inmates on suicide precautions on a daily basis.

(51)   "Step-Down Observation"   The State shall develop and implement a "step-down" level of
observation whereby inmates on suicide precaution are released gradually from more
restrictive levels of supervision to less restrictive levels for an appropriate period of time
prior to their discharge from suicide precautions. The State shall ensure that all inmates
discharged from suicide precautions continue to receive follow-up assessment in
accordance with a treatment plan developed by a qualified mental health professional.

(52)   Intervention   The State shall develop and implement an intervention policy to ensure that
all staff who come into contact with inmates are trained in standard first aid and

16

cardiopulmonary resuscitation; all staff who come into contact with inmates participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts; and shall ensure that an emergency response bag that includes appropriate equipment, including a first aid kit and emergency rescue tool, shall be in close proximity to all housing units. All staff who come into regular contact with inmates shall know the location of this emergency response bag and be trained in its use.

(53)    Mortality and Morbidity Review  The State shall develop and implement policies, procedures, and practices to ensure that a multidisciplinary review is established to review all suicides and serious suicide attempts (e.g., those incidents requiring hospitalization for medical treatment). At a minimum, the review shall comprise an inquiry of: a) circumstances surrounding the incident; b) facility procedures relevant to the incident; c) all relevant training received by involved staff; d) pertinent medical and mental health services/reports involving the victim; e) possible precipitating factors leading to the suicide; and f) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When appropriate, the review team shall develop a written plan (and timetable) to address areas that require corrective action.

## V.    QUALITY ASSURANCE

(54)    Policies and Procedures  The State shall develop and implement written quality assurance policies and procedures to regularly assess and ensure compliance with the terms of this Agreement. These policies and procedures should include, at a minimum:  provisions requiring an annual quality management plan and annual evaluation; quantitative performance measurement with tools to be approved in advance by DOJ; tracking and trending of data; creation of a multidisciplinary team; morbidity and mortality reviews with self-critical analysis, and periodic review of emergency room visits and hospitalizations for ambulatory-sensitive conditions.

(55)    Corrective Action Plans  The State shall develop and implement policies and procedures to address problems that are uncovered during the course of quality assurance activities. The State shall develop and implement corrective action plans to address these problems in such a manner as to prevent them from occurring again in the future.

## VI.    IMPLEMENTATION

(56)    Revision of Activities and Documents  The State shall revise and/or develop as necessary its current policies, procedures, protocols, training, staffing and practices to ensure that they are consistent with, incorporate, address and implement all provisions of this Agreement. The State shall revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement.

(57) Dissemination of Agreement  Within thirty (30) days of the effective date of this Agreement, the State shall distribute copies of the Agreement to all relevant staff, including all medical, mental health and security staff at the Facilities and explain it as appropriate.

(58) In Service Training  Training academy staff shall develop, on an on-going basis, scripts for in service training directed at issues related to effective implementation of the Agreement. In service training shall be provided regularly and shall be documented. In service training scripts shall be provided to DOJ for its review in accordance with the time frames for compliance set forth below.

## VII.   MONITORING, ENFORCEMENT AND TERMINATION

(59) Termination  This Agreement shall terminate three (3) years after its effective date.

(60) Satisfaction of the Agreement and Early Termination  This Agreement may be terminated prior to the conclusion of the three (3) year period described in Paragraph 59 if the State reaches substantial compliance with all provisions of this Agreement and sustains it for one (1) year. "Substantial Compliance" with each and every term of this Agreement for a period of one (1) year shall fully satisfy the Agreement. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance. The State may submit a written request for early termination of the Agreement based upon an assertion of one (1) year of substantial compliance with all substantive paragraphs set forth in Sections III through VIII of this Agreement. The DOJ, in its good faith discretion, will determine whether the State has maintained substantial compliance for the one (1) year period.

(61) Review and Approval  All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be consistent with the substantive terms of this Agreement. All policies, procedures, plans and protocols required by, or referenced in, this Agreement shall be submitted to the DOJ for its review and approval within sixty (60) calendar days after approval of the Action Plan described in Paragraph 65 of this Agreement. Any such plans, policies, procedures and protocols for which this Agreement requires review and approval by DOJ shall be expeditiously reviewed by the DOJ. The DOJ shall not unreasonably withhold any such approval. Absent unforeseen circumstances beyond the Parties' control, if DOJ does not provide a written objection to said materials within sixty (60) days of receipt of same, the materials will be deemed approved by DOJ.

(62) State Response to DOJ Questions  Within thirty (30) days of receipt of written questions from the DOJ concerning the State's compliance with this Agreement, the State shall

18

provide the DOJ with written answers and any requested documents regarding the State's compliance with the requirements of this Agreement.

(63) State Documentation of Compliance  The State shall maintain sufficient records to document its compliance with all of the requirements of this Agreement. The State shall also maintain (so long as this Agreement remains in effect) any and all records required by or developed under this Agreement.

(64) Implementation The State shall implement policies, procedures, plans, and protocols consistent with the Action Plan referred to in Paragraph 65 of this Agreement.

(65) Action Plan Within one hundred and twenty (120) days after the effective date of this Agreement, the State shall prepare and submit to the DOJ a comprehensive action plan ("Action Plan") identifying the specific measures the State intends to take in order to bring the Facilities into compliance with each paragraph containing substantive requirements in Sections III through V of this Agreement ("Substantive Provisions"), including a timeline for completion of each of the measures.

(66) Compliance Reporting  The State shall prepare and submit reports regarding compliance ("Compliance Reports") with each of the Substantive Provisions of this Agreement. The State shall submit its first Compliance Report within ninety (90) days after submitting the Action Plan described in Paragraph 65 of this Agreement, and then every six (6) months. The Compliance Reports shall identify the State's progress in implementing the Action Plan, any revisions to the Action Plan, and shall include a summary of steps taken to implement this Agreement, along with supporting documentation and certifications. Upon achieving substantial compliance as determined by DOJ with any substantive paragraph(s) of this Agreement for one (1) year, no further reporting shall be required on that paragraph.

(67) Selection of Monitor Within ninety (90) days after entry of this Agreement, the State and DOJ shall together select a Monitor. If the Parties are unable to agree on a Monitor, each Party shall submit two names of persons who have experience in corrections and who may have served as a correctional practices expert or monitor, or as a Federal, state, or county prosecutor or judge along with resumes or curricula vitae and cost proposals to a third party neutral, selected with the assistance of the Federal Mediation and Conciliation Service, and the third party neutral shall appoint the Monitor from among the names of qualified persons submitted. The selection of the Monitor shall be conducted solely pursuant to the procedures set forth in this Agreement, and will not be governed by any formal or legal procurement requirements.

(68) Limitations on Public Disclosures by Monitor The Monitor shall not be retained by any current or future litigant or claimant in a claim or suit against the State, its agents or employees. The Monitor shall not issue statements or make findings with regard to any act or omission of the State, or their agents or representatives, except as required by the

19

terms of this Agreement. The Monitor may testify in any case brought by any Party to this Agreement regarding any matter relating to the implementation, enforcement, or dissolution of this Agreement.

(69)  Monitoring Resources The Monitor, at any time, may associate such additional persons or entities as are reasonably necessary to perform the monitoring tasks specified by this Agreement. The Monitor shall notify in writing DOJ and the State if and when such additional persons or entities are selected for association by the Monitor. The notice shall identify and describe the qualifications of the person or entity to be associated and the monitoring task to be performed.

(70)  Monitor's Fees The State shall bear all reasonable fees and costs of the Monitor. In selecting the Monitor, DOJ and the State recognize the importance of ensuring that the fees and costs borne by the State are reasonable, and accordingly fees and costs shall be one factor considered in selecting the Monitor. In the event that any dispute arises regarding the payment of the Monitor's fees and costs, the State, DOJ, and the Monitor shall attempt to resolve such dispute cooperatively.

(71)  Monitor's Duties and Responsibilities The Monitor shall review and report on the State's implementation of, and assist with the State's compliance with, this Agreement. The Monitor shall only have the duties, responsibilities and authority conferred by this Agreement. The Monitor shall not, and is not intended to, replace or take over the role and duties of the State or the Commissioner of the Delaware Department of Corrections. The Monitor may testify in any action brought to enforce this Agreement regarding any matter relating to the implementation or enforcement of the Agreement. The Monitor shall not testify in any other litigation or proceeding with regard to any act or omission of the State, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. Unless such conflict is waived by the Parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The Monitor is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records. The Monitor shall not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement. Provided, however, that this paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

(72)  Technical Assistance by the Monitor The Monitor shall offer the State technical assistance regarding compliance with this Agreement. The Monitor may not modify, amend, diminish, or expand this Agreement.

20

(73) <u>Monitor's Access</u> The State shall provide the Monitor with full and unrestricted access to all of the Facilities, relevant State and facility staff and employees, and any documents (including databases) necessary to carry out the duties assigned to the State by this Agreement. The Monitor's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention, or protocols or analyses involving one of those subject areas. The Monitor shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or DOJ, absent written notice to the State and either written consent by the State or a court order authorizing disclosure.

(74) <u>Monitor's Communication with the Parties</u> In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the State and DOJ. The Monitor shall be permitted to initiate and receive <u>ex parte</u> communications with the Parties and the Parties' consultants.

(75) <u>Compliance Monitoring</u> In order to monitor and report on the State's implementation of each substantive provision of this Agreement, the Monitor shall conduct periodic reviews as the Monitor deems appropriate, but no less than quarterly at each of the Facilities. The Monitor may make recommendations to the Parties regarding measures necessary to ensure full and timely implementation of this Agreement.

(76) <u>Compliance Coordinator</u> The Parties agree that the State shall hire and retain, or reassign a current State employee, for the duration of this Agreement, a Compliance Coordinator. The Compliance Coordinator shall serve as a liaison between the State, the Monitor and DOJ, and shall assist with the State's compliance with this Agreement. At a minimum, the Compliance Coordinator shall: (a) coordinate the State's compliance and implementation of activities required by this Agreement; (b) facilitate the provision of data, documents and other access to State employees and material to the Monitor and DOJ as needed; (c) ensure that all documents and records are maintained as provided in this Agreement; (d) assist in assigning compliance tasks to State personnel, as directed by the Commissioner of the Delaware Department of Corrections or his designee; take primary responsibility for collecting information to provide the State's status reports specified in paragraph 61.

(77) <u>DOJ Access</u> DOJ shall continue to have full and unrestricted access to all documents (including databases), staff, inmates and the Facilities that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege or applicable self-evaluative privileges (e.g., 24 Del. C § 1768). Should the State decline to provide DOJ with access to a document based on attorney-client privilege, the State shall provide the Monitor and DOJ with a log describing the document. DOJ's right of access includes, but is not limited to, all documents regarding medical care, mental health care, suicide prevention and any protocols or analyses involving those subject areas. This Agreement does not authorize, nor shall it be construed to authorize, access to any State documents, except as expressly provided by

21

this Agreement, by persons or entities other than DOJ, the State, and the Monitor.   DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a Court or the Monitor, absent written notice to the State and either written consent by the State or a court order authorizing disclosure. Throughout the duration of this Settlement Agreement, letters between counsel for the DOJ and counsel for the State shall be confidential and subject to the Confidentiality Agreement between the DOJ and the State entered into on May 3, 2006 and supplemented by the Non-Waiver Agreement dated September 28, 2006.

(78)   Timeliness of DOJ Review of Documents and Information   DOJ shall review documents and information provided by the State and the Monitor and shall provide its analysis and comments to the State and the Monitor at appropriate times and in an appropriate manner, consistent with the purpose of this Agreement to promote cooperative efforts.

(79)   Monitor Reports   The Monitor shall issue semi-annual public reports detailing the State's compliance with and implementation of this Agreement. The first report shall issue six months from the effective date of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so.   At least ten business days prior to issuing a report, the Monitor shall provide a draft to the Parties for review and comment to determine if any factual errors have been made. The Monitor shall consider the Parties' responses and then promptly issue the report.

(80)   Noncompliance   If DOJ believes that the State has failed to substantially comply with any obligation under this Agreement, DOJ will, prior to seeking judicial action to enforce the terms of this Agreement, give written notice of the failure to the State. The Parties shall conduct good-faith discussions to resolve the dispute. If the Parties are unable to reach agreement within 15 days of the DOJ's written notice, the Parties shall submit the dispute to mediation. Michael Bromwich, Esq., shall serve as the mediator unless the Parties expressly agree to an alternative selection. The Parties shall split the cost of the mediator. The Parties shall attempt in good faith to mediate the dispute for a minimum of 30 days prior to initiating any court action. DOJ commits to work in good faith with the State to avoid enforcement actions. However, in case of an emergency posing an immediate threat to the health or safety of inmates, the DOJ may omit the notice and cure requirements herein (including the provision regarding mediation), before seeing judicial action. Non-action by the DOJ shall not constitute a waiver of the right to seek judicial action.

(81)   Successors   This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the State.

(82)   Defense of Agreement   The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, the Parties shall seek to remove the matter to a federal court.

(83) <u>Enforcement</u> Failure by either Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreement.

(84) <u>Non-Retaliation</u> The State agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

(85) <u>Severability</u> In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreement.

(86) <u>Notice</u> "Notice" under this Agreement shall be provided via overnight delivery and shall be provided to the Governor of the State of Delaware and to the Attorney General of the State of Delaware.

(87) <u>Subheadings</u> All subheadings in this Agreement are written for convenience of locating individual provisions. If questions arise as to the meanings of individual provisions, the Parties shall follow the text of each provision.

For the DOJ:

/s/ Wan J. Kim
WAN J. KIM
Assistant Attorney General
Civil Rights Division

/s/ Shanetta Y. Cutlar
SHANETTA Y. CUTLAR
Chief
Special Litigation Section

/s/ Daniel H. Weiss
DANIEL H. WEISS
Deputy Chief

23

/s/ Cathleen S. Trainor
CATHLEEN S. TRAINOR
LASHANDA BRANCH CHIRUNGA
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB Room 5908
Washington, D.C. 20530
(202) 514-6255

For the State of Delaware:

/s/ Carl C. Danberg
CARL C. DANBERG
Attorney General of Delaware

/s/ Stanley W. Taylor, Jr.
STANLEY W. TAYLOR, Jr.
Commissioner
Delaware Department of Correction
245 McKee Road
Dover, DE 19904

/s/ Michael R. Bromwich
MICHAEL R. BROMWICH
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Dated: December 29, 2006

24