IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES W. RILEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 06-001-GMS |
| | ) |
| STANLEY TAYLOR, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

## I. INTRODUCTION

The plaintiff, James W. Riley ("Riley"), an inmate housed at the James T. Vaughn

Correctional Center ("VCC"), Smyrna, Delaware, filed this civil rights action on December 17,

2005, pursuant to 42 U.S.C. § 1983[1] alleging deliberate indifference to serious medical needs

(i.e., rectal dysfunction, need for eyeglasses, orthopedic footwear, skin infection).[2] (D.I. 2.) An

amended complaint was filed on January 4, 2007. (D.I. 52.) Now before the court are motions

for summary judgment filed by the defendants former Delaware Department of Correction

("DOC") Commissioner Stan Taylor ("Taylor"), former VCC Warden Tom Carroll ("Carroll"),

and Deputy Warden David Pierce ("Pierce") (collectively "State defendants") (D.I. 125) and by

the defendants Correctional Medical Services, Inc. ("CMS") and Christine Malaney ("Malaney)

(collectively "medical defendants") (D.I. 127). Riley opposes the motions and moves for an

---

[1]When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

[2]On December 7, 2006, the court granted summary judgment as to the skin infection claim. (*See* D.I. 49.)

evidentiary hearing to determine the issue of exhaustion of administrative remedies. (D.I. 144, 145.) The court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. BACKGROUND

The following facts are taken from the complaint and other documents and exhibits submitted by the parties. The first claim raised against Carroll, medical providers, and their staff, alleges that, beginning in 2002, Riley sought treatment for rectal dysfunction (hereafter "hemorrhoids")[3] stemming from a 1998 injury. (D.I. 2, at 3.) He complained to Carroll, to no avail. Riley alleges that in 2004 and 2005, during his annual physical examinations, he complained to doctors about his untreated hemorrhoids, that he might need surgery, but nothing was done. *Id.* The second claim, raised against Carroll, Pierce, medical providers, and their staff alleges that during his 2004 and 2005 medical examinations, Riley was prescribed eyeglasses and special orthopedic footwear (i.e., boots and sneakers) due to an ankle condition, but the medical staff refused to provide him with the prescribed items. *Id.* at 3-4. He wrote letters to Carroll and Pierce. Riley alleges that Carroll disregarded his complaints, but Pierce sent his complaints to health services administrators for investigation. Riley complained to Pierce that Malaney failed to investigate the matter and did not correct the denial of medical treatment or failure to provide footwear and eyeglasses. Finally, the third claim, raised against Taylor and Carroll alleges that they are responsible for the denial of medical treatment because of DOC policies. Riley further alleges that in hiring CMS and the defendant First Correctional Medical ("FCM")[4], Taylor knew,

---

[3]Riley was diagnosed with hemorrhoids.

[4]A waiver of service for FCM was returned executed and filed on July 26, 2006. (D.I. 24.) To date, FCM has not answered or otherwise appeared.

or should have known, that these medical vendors used inadequate and unqualified medical staff and employees.

CMS provided medical services for DOC institutions from July 1, 2000, through June 30, 2002. *Francisco v. Correctional Med. Sys.*, Civ. No. 03-499-JJF, 2007 WL 896190, at *1 (D. Del. Mar. 22, 2007) (not published). FCM provided medical services to the DOC from July 1, 2002, through June 30, 2005. *Id.* On July 1, 2002, CMS once again became the medical service provider for the DOC institutions. *Id.*

*Hemorrhoids*. Riley believes that his hemorrhoid problem began in 1998 while he was exercising. (D.I. 128, ex. A38.) During his incarceration, Riley has developed a daily exercise routine of jogging for forty-five minutes, doing pull-ups, five hundred push-ups, and ten sets of thirty to forty squats. (*Id.* at A13-16.) In 1998, he had been squatting four hundred pounds and felt something rip in his rectum, but he was able to continue to work-out and lift four hundred pounds. (*Id.* at A13-16, A39.) Riley had no problems until 2002 when he had rectal swelling with bowel movements, and medical records indicate that Riley sought treatment on September 21, 2002. (D.I. 115; D.I. 128 ex. A36, A39-40.) Riley was prescribed Colace[5] and a hemorrhoidal creme for a one month period from September to October 2002. (D.I. 115; D. I. 126, ex. D3-4.) He used the items for a month but they were ineffective (D.I. 126, D3-4.) After that, Riley used hemorrhoidal cream purchased from the commissary. (*Id.* at D4.)

Riley filed a grievance on October 3, 2002, regarding his hemorrhoids complaining that he had seen a doctor several weeks earlier, that the doctor had prescribed medication without conducting a physical examination, and that the medication did not alleviate painful swelling

---

[5]A stool softener. http://www.colacecapsules.com.

(D.I. 126, ex. B.) Riley opined in his grievance, "I think surgery is necessary to correct the problem." (*Id.*) He sought an "adequate examination to diagnose the injury to his rectum and schedule [him] for surgery if needed." (*Id.*) Riley filed a second grievance on June 16, 2003, complaining that he had not received a response to his first grievance. (*Id.*) He wrote a letter to Carroll on October 21, 2003, complaining that he had filed two medical grievances for his rectal condition, but both were ignored and asked Carroll to contact the medical department to direct them to treat him. (D.I. 141, ex. E-1.)

Riley testified that he wrote to Carroll twice, explaining that his rectum hurt, he was in pain, and did not believe he was receiving appropriate treatment. (D.I. 127, ex. D7.) Riley testified that Carroll did not respond and he sued him because Carroll "knew" that Riley was being mistreated by the medical staff and failed to do anything about it. (*Id.* at D8.) Carroll states that he had no knowledge of Riley's prescribed medication or medical treatment. (D.I. 126, ex. E ¶ 5.) Carroll states that letters relating to medical judgment concerns received from inmates were forwarded to the medical provider, and medical decisions are made by the treating health care professionals with whom the DOC contracted. (*Id.*)

The affidavit of Lise M. Merson ("Merson"), inmate grievance chairperson states that her review of all grievances and appeals filed by Riley from January 1, 2002, to January 2, 2008, failed to produce records of grievances from Riley relating to hemorrhoids or eyeglasses. (D.I. 127, ex. C.) Riley testified that he did not file any medical grievances concerning his hemorrhoids from July 1, 2002 through July 1, 2005 (during this time FCM was the healthcare provider) or after July 1, 2005, and through the present. (D.I. 128, ex. at A89.)

Riley continued to exercise with no abatement of the pain and swelling he experienced following a bowel movement. (D.I. 128, ex. A38, A67.) The swelling diminished on its own after a certain period of time. (*Id*. at A67.) Riley testified that once the swelling subsided, he did not have pain and he was "back to normal until the next bowel movement." (*Id*. at A74.) Riley underwent a physical examination on January 29, 2003. (D.I. 82.) The general impression for the rectal area was marked "deferred." (D.I. 82.) Riley underwent a physical examination on January 21, 2005, and areas marked "deferred" included the hernia, rectal, and genital areas. (D.I. 82.)

Riley did not file a sick call for rectal complaints for several years following his September 21, 2002 sick call slip. (D.I. 128, ex. A76.) Nor did he go to medical or seek medical treatment for the condition for a period of time. (*Id*. at A77.) Riley testified that he was busy with his criminal trial and did not "complain anymore." (*Id*. at A78.) He treated his hemorrhoids with medication he purchased from the commissary and used hot compressions. (*Id.* at A79.) He "reactivated" this case following the resolution of his criminal matter and the publication of a newspaper article concerning prisons. (*Id*.) One of the reasons Riley decided to file this lawsuit was "based upon all the stuff [he] read in the paper". (*Id*. at A81.)

Medical records indicate that as of 2007 Riley had been diagnosed with a large prolapsing hemorrhoid. (D.I. 107.) He received hemorrhoidal treatment throughout 2007. (D.I. 82, D.I. 117.) Dr. Louise Desrosiers ("Dr. Desrosiers") treated Riley in 2007 and 2008 and is familiar with his medical condition. (D.I. 128, ex. B.) In April 2007, Riley received Anusol-HC Cream, Metamucil and Colace 100 mg to treat his hemorrhoids. (*Id.* at ¶ 2.) In August 2007, November 2007, and December 2007 outside consultation requests were written for Riley to see a surgeon

-5-

for a hemorrhoidectomy assessment. (*Id.* at ¶ 3.) A fourth consultation request was written on March 20, 2008, noting that there had been no change with conservative treatment. *(Id.* at ¶ 4.) Riley was seen by an outside consultant on April 15, 2008, who recommended that prior to proceeding with a PPH hemorrhoidectomy procedure, a colonoscopy should be performed due to Riley's description of recurrent rectal blood. (*Id.* at ¶ 5.) The examination revealed stage III, moderate sized internal hemorrhoids. (D.I. 124) Riley provided a history of hemorrhoidal symptoms since 2002. (D.I. 142.) A consultation request was written for a colonoscopy, and it was scheduled for June 2008. (D.I. 128, ¶¶ 6,7.) The hemorrhoidectomy was performed on June 12, 2008, Riley returned to the VCC, and was discharged from the infirmary on July 12, 2008. (D.I. 115, D.I. 128, ex. B ¶ 7.) Prior to the hemorrhoidectomy, a physician had unsuccessfully attempted to manually manipulate the hemorrhoids. (D.I. 126, ex. D12.) Riley testified that the pain subsided once the surgery healed. (D.I. 128, ex. A35.)

*Medical/Orthopedic Shoes*. While Riley was on death row, the State provided him with shoes. After he was released from death row in 2003, Riley wore boots given to him by another inmate, until he wore them out. (D.I. 126, ex. D28.) After that, medical issued him a pair of sneakers. (*Id.* at D28.) On June 15, 2003, Riley requested a pair of boots or sneakers with adequate ankle support because of his ankle problems. (D.I. 22, ex. 4.) FCM requested high top sneakers for Riley on June 27, 2003, due to his right ankle medical history. *Id.* The request was approved on July 27, 2003, Riley was prescribed high top sneakers on August 7, 2003, and he received the sneakers from FCM on November 12, 2003. (D.I. 22. ex. 4, D.I. 134.) In early January 2004, Riley was scheduled to see a medical provider for an evaluation for boots. *Id.*

Progress notes dated January 22, 2004, indicate that Riley requested orthopedic boots and sneakers, but his boot request was denied. *Id.*

A physician's order sheet dated January 21, 2005, ordered Riley high top boots. (D.I. 22, ex. 4.) FCM requested high top boots on the same date. (*Id.*) Riley requested boots and sneakers on February 20, 2005, and medical records indicate they were ordered. (*Id.*) On March 2, 2005, Riley filed a grievance seeking special footwear for medical reasons. (D.I. 20, Ex. A4.) The grievance states that several months earlier, on two different occasions, two doctors approved Riley for high-top boots and sneakers, and that in 1995 a doctor had ordered Riley special footwear. *Id.* Riley asked for a memo to permit him two pairs of sneakers, one for walking and one for exercise. *Id.*

Riley wrote to Pierce on May 7, 2005, complaining that special sneakers were approved during his annual exam and that he also needed special boots. (D.I. 20, ex. A16-17; D.I. 126, ex. D2.) At the time, Pierce was the deputy warden I at the VCC.[6] (D.I. 126, ex. F, ¶ 1.) His duties included responsibility for security of the facility and acting as a liaison with internal and contractual groups who operated the VCC grounds.[7] (*Id.*) Pierce responded to Riley's complaints and informed him that since they related to medical judgments, his correspondence would be forwarded to the medical provider for review. (*Id.* at ¶ 2.) Riley testified that Pierce

---

[6]Pierce's officer took over medical requests in 2005 in an effort to streamline the communication with the medical services provider. (D.I. 125, ex. F ¶ 3.) Pierce forwarded inmate correspondence requiring medical judgment responses to the medical provider for its review and action. (*Id.* at ¶ 5.)

[7]Pierce transitioned out of the liaison position in the Spring of 2008 and now attends meetings only occasionally. (D.I. 126, ex. F ¶ 6.)

always responded to inmates, but that medical does not listen to him. (D.I. 126, ex. D2 .) He also testified that he thought Pierce sent letters to Malaney, but she never responded. (D.I. 128, ex. A86.) Riley is unaware of Malaney's job title and never made specific complaints to her regarding his medical care. (*Id.* at A87.) He could not point to anything that Malaney did or failed to do with respect to his medical care. (*Id.* at A87-88.)

While Pierce was unable to overrule professional opinions of medical personnel and suggest different courses of treatment, he shared inmates' concerns with medical managers through written correspondence and at meetings. (*Id.* at ¶ 4.) He is not permitted to authorize additional medical treatment outside of the state contracted services. (*Id.* at ¶ 5.) Riley testified that he sued Pierce because he failed to do anything. (*Id.* at D11.)

A letter to Pierce dated July 9, 2005, indicates that Riley was given a choice between sneakers or boots, but that Riley believed he was entitled to both. (D.I. 20, ex. A20-21.) Pierce responded to Riley on July 22, 2005, that he was forwarding his footwear concerns to Health Services Administrator Malaney. *Id.* at A19. On July 11, 2005, Riley was seen at medical and requested his sneakers. (D.I. 22, ex. 4.) The grievance indicates that sneakers were to be ordered, that the grievance was withdrawn, and that Riley signed off on the grievance on August 29, 2005. (D.I. 20, exs. A4-A6; D.I. 127, ex. C.) As of March 27, 2006, Riley had not received the sneakers. (D.I. 20, ex. A33-34.) On November 10, 2006, an order was written for high top sneakers as a result of Riley's grievance. (D.I. 46.) On April 2, 2007, Riley signed a CMS receipt for medical product - sneaker. (D.I. 115) A November 21, 2007 consultation requested stated, "needs high top sneaker" . . . "please try to get hitop [sic] DOC shoe/boot" . . . "discussed with Lt. Proface = boots are not allowed in "MHU" + not given for medical reasons." (D.I. 107.)

-8-

An email on the same date refers to a grievance Rile submitted for special shoes (D.I. 141, ex. C2.)

At the time of his deposition, Riley was wearing Nike high top tennis shoes that he had received from medical the previous year.[8] (D.I. 128, ex. A46.) Riley does not wear his medically issued sneakers when he works out because he does not want to wear them out. (*Id.* at A51.) Instead, Riley saves his medically issued Nike high-tops for walking around, and exercises and works out in State issued sneakers, even though the State issued sneakers have no support. (*Id.* at A51-52.) Riley testified that he is able to obtain a pair of sneakers from the State at any time. *(Id.* at A53-54.)

*Eye examination/eyeglasses.* Riley testified that he did not have a problem and did not need glasses until after 2003. (D.I. 128, ex A54, A61.) He needed glasses due to his and they are required for reading. (D.I. 126, at D20-21.) On January 21, 2005, a physician ordered an "opth" eye doctor consult. (D.I. 22, ex. 4.) Riley wrote to Pierce on May 9, 2005, advising him that during his annual physical examination the doctor approved eyeglasses after discovering Riley had severely impaired vision. (D.I. 20, ex. A16.)

On March 27, 2006, Riley's eyes were examined and a consultation request for an optometrist was written on November 10, 2006. (D.I. 141, ex. C6.) The consultation request states, "asked to write consult from a grievance hearing. pt. c/o blurred vision and decrease visual acuity". (*Id.*) His eyes were examined on December 22, 2006. (D.I. 107.) On January 19, 2007, Riley was offered his prescription eyeglasses and refused them. (D.I. 82.) A

---

[8]Riley was deposed some time after December 19, 2008. (*See* "so ordered" granting D.I. 118.)

consultation request was written on March 27, 2007, for Riley to see an optometrist. (D.I. 82.)
An email dated November 21, 2007, refers to a grievance submitted by Riley for an
ophthalmology appointment because his glasses did not correct his vision problem. (D.I. 141, ex.
C2.)

Riley testified that he has had an eye exam and has been provided with a pair of bifocal
glasses. (D.I. 128, ex. A54-55.) The bifocal glasses were issued to him last year, but he refuses
to wear them. (*Id*. at A54-55.) Riley agreed that the problem with the bifocals is more a problem
with how he positions his eyes. (*Id*. at A58.) Nurses indicated to him that there was a way to
wear the glasses so that he could see, but Riley does not use the glasses. (*Id*. at A58-60.) Riley
returned to the eye doctor following receipt of the glasses for another examination. (*Id*. at A63.)
Riley testified that he wants two pair of glasses. (*Id*. at A64.) One pair with the bifocal lens and
one pair with no bifocal lens because he believes that the bifocal lens was throwing off his focus.
(*Id*.) Riley's testimony indicates that he has had been unable to adjust to the bifocal lenses.[9] (*Id.*
at A57-60.)

*DOC Policies*. Carroll held the position of warden at VCC from October 1, 2001 through
August 21, 2007, and is now the deputy commissioner of the DOC. (D.I. 126, ex. E.) During
part of the relevant time period, DOC health care was provided by FCM who provided many of

---

[9]After he filed this lawsuit, Riley submitted grievance 187795 on September 16, 2009,
raising footwear and eyeglass issues similar to those as alleged in his complaint. (D.I. 141, ex.
A3-A12.) The Medical Grievance Committee recommended that the grievance be denied, noting
that Riley had received sneakers as ordered by the physician and one pair was authorized; Riley
has had glasses since 2007 without any requests for a re-evaluation and just wants his glasses
changed. (*Id.* at A12.) Riley appealed and the appeal was upheld. (*Id.* at A10.) Investigation
indicated that the wrong width sneakers were ordered, the problem corrected, and the correct size
ordered. (*Id.*) Riley was advised to place a sick call slip for an eye examination and a new
prescription for glasses, if necessary. (*Id.*)

the same services as CMS. (D.I. 126, ex. E ¶ 3.) The DOC requires its health care providers to meet the standards for correctional health care as set forth by the National Commission on Correctional Health Care ("NCCHC"). (*Id.*) All protocols and policies for the delivery of services are set by the NCCHC and the medical health care provider. (*Id.*) Once an inmate is transferred to the medical department in DOC facilities, there is little or no involvement by the facility's non-medical personnel in their care. (*Id.* at ¶ 5.)

Riley testified that he sued Taylor because Taylor knew that medical was denying Riley medical treatment, and Taylor failed to stop it. (*Id.* at D8.) When asked how Taylor knew this, Riley replied, "that's the way it's always been." (*Id.* at D9.) The U.S. Department of Justice ("DOJ") conducted an investigation of the health care system of DOC facilities and, on December 29, 2006, reported its findings to then Delaware Governor Ruth Ann Minner of Delaware regarding the health care system at DOC facilities.[10] (D.I. 141, exs. G) Deficiencies were discovered in several areas, but the DOJ noted that the Taylor, then DOC Commissioner, unequivocally indicated the clear desire to improve medical and mental health care services at the DOC facilities. (*Id.*)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita*

---

[10]Riley also submitted a portion of a September 25, 2005 newspaper article (published prior to the DOC investigation) that discusses the medical system at the DOC, specific cases of lack of treatment, and pending lawsuits at that time. (D.I. 141, ex. H.)

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). The facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences from the evidence must be drawn in that parties' favor. *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The State defendants move for summary judgment on the grounds that Riley failed to exhaust his administrative remedies on the medical needs issue; his hemorrhoid claim is time-barred; they lack the requisite personal involvement necessary for a 42 U.S.C. § 1983 claim; they were not deliberately indifferent to Riley's medical needs; and they are entitled to qualified immunity. (D.I. 126.) The medical defendants move for summary judgment on the grounds that CMS cannot be liable for the constitutional claims asserted by Riley; there is no conduct on the part of Malaney that demonstrates deliberate indifference to Riley's serious medical needs; and Riley failed to exhaust his administrative remedies. (D.I. 128.) Riley opposes the motions.[11] (D.I. 141.) He argues that he had serious medical problems for which he did not receive adequate medical diagnoses and treatment, he continues to be denied treatment, and there remain

---

[11]Riley submitted an un-notarized affidavit on December 16, 2009, and advised the court he would submit the original notarized affidavit as soon as prison officials notarized it. (D.I. 141, 143.) To date, he has not submitted the original notarized affidavit.

-12-

issues of fact whether he exhausted his administrative remedies thus precluding summary judgment.

## IV. DISCUSSION

### A. Administrative Remedies

The State defendants argue that Riley failed to exhaust his administrative remedies with regard to his hemorrhoids and eyeglasses claims prior to filing this lawsuit.  (D.I. 126, ¶¶ 4-8.) Similarly, the medical providers move for summary judgment asserting Riley's failure to exhaust administrative remedies, but they also contend that Riley did not exhaust his administrative remedies for sneakers while CMS was the medical provider.  (D.I. 128, ¶ C.)

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Under *Woodford v. Ngo*, 548 U.S. 81 (2006), exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 88. As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA.

-13-

*Jackson v. Ivans*, 244 F. App'x 508, 513 (3d Cir. 2007) (not published) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance."). "'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion." *Williams v. Beard,* 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis,* 372 F.3d 218, 231 (3d Cir. 2004)). Third Circuit case law makes clear that a prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. *Nickens v. Department of Corr.,* 277 F. App'x 148, 152 (3d Cir. 2008) (not published) (citing *Williams*, 482 F.3d at 639; *Spruill,* 372 F.3d at 228, 231).

The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill v. Gillis*, 372 F.3d 218, 227-28 (3d Cir. 2004); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000); *but see Freeman v. Snyder,* Civ. No. 98-636-GMS, 2001 WL 515258, at *7 (D. Del. Apr. 10, 2001) (finding that if no administrative remedy is available, the exhaustion requirement need not be met). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002).

Delaware Department of Correction ("DOC") administrative procedures provide for a multi-tiered grievance and appeal process. DOC Policy 4.4 (revised May 15, 1998). Medical grievances are first forwarded to the medical services staff who attempt an informal resolution of the matter. If this fails, the grievance goes to the Medical Grievance Committee, who conducts a hearing. If the matter is still not resolved, the inmate may once again appeal. DOC Policy 4.4 (revised May 15, 1998).

-14-

The record contains two grievances filed by Riley prior to the filing of this lawsuit, one in 2002 and one in 2003 complaining of hemorrhoids. Riley states that the grievances were never answered while the State defendants indicate that its records, from January 1, 2002, to January 1, 2008, do not contain any grievances relating to hemorrhoids. During his deposition, Riley testified that he did not file any grievances regarding his rectal problem from July 1, 2002, up to the date of his deposition that took place some time after December 19, 2008.

With regard to the sneakers, the record reflects that Riley submitted a grievance prior to filing this lawsuit, the parties resolved the issue, and the grievance was withdrawn. With regard to the eyeglasses issue, while the record does not contain any written grievances, an email from a prison official dated April 2, 2007, states that in his special shoes grievance Riley also requested an ophthalmology eye consultation. Additionally, the consultation request, dated November 10, 2006, refers to a grievance hearing wherein Riley complained of blurred vision and decreased visual acuity.

Riley has failed to demonstrate that he has exhausted his hemorrhoid claim. He argues in a conclusory fashion that the defendants thwarted his ability to exhaust his administrative remedies, but provides no support for this position other than to state that they did not respond or answer the grievance. The State defendants' records do not contain any grievances submitted by Riley on the issue. To the extent that Riley sent a letter to Carroll complaining that his grievances were ignored, said act is not the appropriate method to exhaust administrative remedies under the DOC Prison Grievance Procedure. Additionally, Riley was aware by at least October 21, 2003, when he wrote to Carroll, that there had been no response to his grievances. He did nothing, but waited two more years, until December 17, 2005, to file this case. Riley

-15-

could have resubmitted grievances when, as he claimed, it became apparent the initial grievances had been ignored.[12]  Notably, Riley testified that he did not seek medical attention or take interest in his hemorrhoidal condition because he was busy with his criminal litigation.

With regard to the eyeglasses claim, there remains genuine issue of fact as to whether the claim is exhausted.  An email obtained from the State refers to the submission of a grievance and a grievance hearing as to Riley's vision complaints.[13]  Finally, the record reflects that Riley exhausted the claims for medically issued sneakers.  It matters not that the grievances were filed prior to the time that CMS became the medical services provider.

Riley's failure to properly exhaust the hemorrhoid issue is fatal to his claim.  "[I]t is beyond the power of this court . . . to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73.  Accordingly, the court will grant the defendants' motions for summary judgment as to the issue of exhaustion of administrative remedies of the hemorrhoid claim and will deny the defendants' motions for summary judgment on the issue exhaustion of administrative remedies as to the special shoes and eyeglasses issues.

### B. Statute of Limitations

The State defendants also move for summary judgment on the grounds that the hemorrhoid claim is time-barred.  Riley filed his complaint on December 17, 2005, as determined

---

[12]As will be discussed, even if Riley had exhausted his administrative remedies, the record does not support his claim that the State defendants and medical defendants were deliberately indifferent to his hemorrhoid condition.

[13]Although the court finds that Riley exhausted his sneaker and eye care claim as to the moving defendants, the record reflects that, as to FCM, Riley he failed to exhaust his administrative remedies on the eyeglasses claim.  The record reflects that Riley did not file any eye care grievances until a date after the time FCM stopped providing health care services to DOC institutions.

-16-

by the mailbox rule for prisoner filings.[14] *See Houston v. Lack*, 487 U.S. 266 (1988); *Burns v. Morton*, 134 F.3d 109, 112 (3d Cir. 1998); *Gibbs v. Deckers*, 234 F. Supp. 2d 458, 463 (D. Del. 2002). For purposes of the statute of limitations, § 1983 claims are characterized as personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 275 (1983). In Delaware, § 1983 claims are subject to a two-year limitations period. *See* 10 Del. C. § 8119; *Johnson v. Cullen*, 925 F. Supp. 244, 248 (D. Del. 1996). Section 1983 claims accrue "when plaintiff knows or has reason to know of the injury that forms the basis of his or her cause of action." *Montgomery v. De Simone,* 159 F.3d 120, 126 (3d Cir. 1998). Claims not filed within the two-year statute of limitations period are time-barred and must be dismissed. *See Mattis v. Dohman,* 260 F. App'x 458 n.3 (3d Cir. 2008) (not published). However, because the PLRA makes exhaustion of administrative remedies mandatory, the statute of limitations begins to run only when the plaintiff has exhausted his administrative remedies. *Wright v. O'Hara*, No. Civ. A. 00-1557, 2004 WL 1793018, at *6 (E.D. Pa. Aug. 11, 2004); *Howard v. Snyder*, Civ. No. 01-376-SLR, 2002 U.S. Dist. LEXIS 9084, at *4 (D. Del. May 14, 2002). Although our Court of Appeals has not yet ruled on the issue, this court has held that the statute of limitations begins to run only when plaintiff has exhausted his administrative remedies under the PLRA. *See Howard v. Snyder*, 2002 U.S. Dist. LEXIS 9084; *see also Cooper v. Beard*, 2006 WL 3208783, at *8 (E.D. Pa. Nov. 2, 2006) ("an inmate would be placed in a situation where his suit would either be barred from federal court for failure to exhaust administrative remedies under the PLRA, or time-barred because he had pursued those administrative remedies").

_____

[14]The complaint was signed on December 17, 2005. Therefore, the court concludes that it was filed on the date it was signed, the earliest date possible that it could have been delivered to prison officials in Delaware for mailing.

As discussed above, Riley failed to exhaust his administrative remedies with regard to the hemorrhoid claim. Accordingly, the court looks to the date when Riley knew or had reason to know of the injury that formed the basis of his cause of action. Riley submitted his hemorrhoid grievances on October 3, 2002 and June 15, 2003, and wrote to Carroll on October 21, 2003. Giving Riley the benefit of the doubt, he knew of his injury by at least October 21, 2003, the date that he wrote to Carroll. Yet, he did not file this lawsuit until December 17, 2005, over two years from the date the claim accrued. For the above reasons, the court will grant the State defendants' motion for summary judgment as to the hemorrhoid claim as it is barred by the two-year statute of limitations. Additionally, claims Riley raises against FCM or CMS that arose two years prior to December 17, 2005, are also time-barred.

### C. Personal Involvement/Respondeat Superior

The State defendants move for summary judgment on the Eighth Amendment claims on the grounds that their personal involvement is insufficient to impose liability under § 1983. The medical defendants move for summary judgment on behalf of Malaney on the grounds that there is no conduct by her that demonstrates deliberate indifference to Riley's serious medical needs. Riley responds that Taylor, Carroll, and Pierce are liable under a theory of respondeat superior. He makes no argument with regard to Malaney.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003)(quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207.

-18-

As is well established, supervisory liability cannot be imposed under § 1983 on a

respondeat superior theory.[15] *See Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937; *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976).

"'A[n individual government] defendant in a civil rights action must have personal involvement

in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat

superior.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*,

845 F.2d 1195, 1207 (3d Cir. 1988). Purpose rather than knowledge is required to impose

liability on an official charged with violations arising from his or her superintendent

responsibilities.[16] *Iqbal*, 129 S.Ct. at 1949. "Absent vicarious liability, each Government

official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

Participation in the after-the-fact review of a grievance is not enough to establish personal

involvement. *See, e.g., Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (not published)

(allegations that prison officials and administrators responded inappropriately to inmate's later-

filed grievances do not establish the involvement of those officials and administrators in the

underlying deprivation). *See also Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa. 1997), *aff'd,*

---

[15]In *Iqbal*, the plaintiff alleged supervisory officials violated his rights because one official was the "principal architect" of the policy, and another was "implemental" in adoption and execution of the policy. *See id.* at 1944. The Supreme Court found the allegations facially insufficient. *See Iqbal*, 129 S.Ct. at 1949 (quoting *Robertson v. Sichel,* 127 U.S. 507, 515-516 (1888), for the proposition that "[a] public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties").

[16]In light of *Iqbal*, it is uncertain whether proof of personal knowledge, with nothing more, provides a sufficient basis to impose liability upon a supervisory official. *See Bayer v. Monroe County Children and Youth Services*, 577 F.3d 186, 190 n.5 (3d Cir. 2009)

-19-

142 F.3d 430 (3d Cir. 1998) (prison officials' failure to respond to inmate's grievance does not state a constitutional claim). Nor does the act of transmitting correspondence to a prison official suffice to impose supervisory liability. *See Spencer v. Kelchner*, Civ. No. 06-1099, 2007 WL 88084, at *7 (M.D. Pa. Jan 9, 2007).

As to Malaney, Riley could point to nothing that Malaney did or failed to do with respect to his medical care. As to Carroll, and Pierce, the record reflects that Riley wrote letters to them complaining about his medical care and treatment but as noted above, without more, this fails to impose liability. Riley presumed that Taylor was aware of his medical condition, but presented no evidence to support his position. Nonetheless, Riley argues that the State defendants were engaged in a well-documented policy, practice, and custom of unconstitutional Eighth Amendment violations against the entire prison population and, therefore, are liable under a respondeat superior theory. In support of his position, Riley relies upon the December 29, 2006 DOJ letter regarding the health care system at DOC facilities and the September 25, 2005, newspaper article regarding prison conditions and wrongful death lawsuits.

The wrongful death lawsuits have nothing to do with Riley's claims. While the DOJ letter speaks to systemic deficiencies at the VCC, only one of the deficiencies listed speaks to a delay in treatment of which Riley complains.[17] Moreover, Riley did not refute Carroll's statements that the DOC requires its health care providers to meet the standards for correctional

_____

[17]The letter addresses the following issues: sick call, acute care (i.e., life threatening conditions), chronic care, speciality care, skin infections, medication administration and management, mental health care, and suicide prevention. Riley testified that he was always seen whenever he submitted a sick call slip. (D.I. 128, A72-73.) The record does reflect some difficulty in obtaining outside speciality care once Riley decided to pursue treatment for his hemorrhoids. Ultimately, however, Riley received outside medical treatment.

-20-

health care as set forth by the NCCHC or that all protocols and policies for the delivery of services are set by the NCCHC and the medical health care provider. Nor does he refute the fact that once an inmate is transferred to the medical department in DOC facilities, there is little or no involvement by the facility's non-medical personnel in the inmate's care.

Based upon the facts and the law, the court concludes that summary judgment is appropriate as to the issue of lack of personal involvement and, therefore, will grant the defendants' motions for summary judgment on the issue. Assuming, arguendo, that the defendants did possess the requisite personal involvement for a § 1983 claim, as will be discussed below, they were not deliberately indifferent to Riley's medical needs.

### D. Medical Needs

The state defendants move for summary judgment on the grounds that they were not deliberately indifferent to Riley's medical needs. The medical defendants move for summary judgment on behalf of CMS on the grounds that it cannot be liable for the constitutional claims asserted by Riley, and there were no policies or conduct that demonstrated deliberate indifference to Riley's serious medical needs. All moving defendants contend that Riley's disagreement with his treatment sounds in medical negligence, not constitutional deliberate indifference. Riley responds that there is no merit to the defendants' motions because there is no dispute that the his medical conditions and the need for treatment are serious within the standards of *Estelle v. Gamble*, 429 U.S. 97 (1976), it is undisputed that he did not receive adequate diagnoses and medical treatment for six to eight years causing unnecessary pain and irreparable injuries to his eye and foot, and he continues to be denied proper eyeglasses and footwear. Riley further contends that even if CMS was not the medical provider when he filed his hemorrhoid grievance

in 2002, it was lawfully obligated to redress all unprocessed pending grievances left behind by its predecessor FCM.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976).  However, in order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000).  An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).  Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation).  Finally, "mere disagreement as to the proper medical treatment" is insufficient to

-22-

state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

Additionally, the U.S. Court of Appeals for the Third Circuit has concluded that prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (discussing *Durmer*, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236. Finally, "absent viable claims that the medical defendants violated his constitutional rights [plaintiff] cannot state a claim against the non-medical defendants for failure to cure the medical defendants' conduct." *Serrano v. Folino*, No. 08-2107, slip op. at 8 (3d Cir. July 29, 2009).

With regard to the State defendants, the record reflects that Riley wrote to Carroll and Pierce prior to filing this lawsuit regarding his medical care. Hence, absent evidence to the contrary, the States defendants were justified in believing that plaintiff was receiving adequate medical care. Notably, Riley testified that Pierce always responded to his concerns. Riley testified that Carroll "knew" of the inaction the medical staff, but failed to do anything about it. Riley did not testify how Carroll "knew" and Riley failed to refute Carroll's statement that he had no knowledge of Riley's prescribed medical or medical treatment. Moreover, Carroll stated that letters relating to medical judgment concerns received from inmates were forwarded to the

-23-

medical provider. There is nothing in the records that indicates Taylor was aware of Riley's medical issues. Based upon the foregoing, the court concludes that reasonable jury could not find that the State defendants were deliberately indifferent to Riley's serious medical needs. Further, as discussed below, it is evident that Riley received medical treatment, albeit not to his liking.          With regard to CMS, when a plaintiff relies upon a theory of respondeat superior to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to establish that CMS is directly liable for the alleged constitutional violations, Riley "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).

Assuming the acts of CMS' employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting *Andrews*

-24-

*v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)). The medical defendants argue that Riley has failed to produce any evidence to leading to the existence of an inference that a policy or custom demonstrated deliberate its deliberate indifference.

CMS followed FMC and became the medical service provider for the DOC on July 1, 2005. At the time Riley filed his complaint, CMS had been the medical service provider for approximately six months. The medical records reveal that Riley did not seek medical care for his hemorrhoids for several years following his September 21, 2002 sick call slip. Indeed, he testified that he was busy with his criminal trial and appeals so he made no complaints. Also, Riley did not file a medical grievance regarding his hemorrhoid issues while CMS was the medical provider, and therefore, the record fails to support a finding that indicates it not until Riley filed this lawsuit in December 2005 that it became aware of his concerns. Indeed, Riley refers to CMS' notice in his response to the motions for summary judgment, as follows: "Even after defendants were placed on NOTICE by filing this lawsuit in 2005, it still took defendants three years to adequately treat [Riley]". (D.I. 141, at 3.) Further, contrary to his assertions that medical treatment was delayed for many years, while it is true that Riley underwent a minor hemorrhoidal medical procedure in 2008, the record reflects that he received medical treatment for other complaints in 2005, 2006, and 2007. Given Riley's sporadic requests for medical

treatment for his hemorrhoids, and CMS' record in responding to his requests, Riley has failed to demonstrate a policy or custom demonstrating deliberate indifference on behalf of CMS.

Additionally, Riley's position that he continues to be deprived special shoes and eye care is not borne by the record. It is evident from the record that he has been provided with sneakers and eyeglasses. His real issue is that would like to have two pairs of sneakers and, rather than bifocals, separate glasses because he has not adjusted to bifocal lenses. Finally, it is apparent from Riley's deposition testimony that he received treatment, but he disagreed with the type of treatment he received. As is well-known, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted). For the above reasons, the court will grant the defendants' motions for summary judgment as to the medical needs issue.[18]

## V. CONCLUSION

For the above reasons the court will grant the defendants' motions for summary judgment. (D.I. 125, 127.) The court will deny as moot Riley's motion for hearing. (D.I. 145.) The sole remaining defendant is FCM.

An appropriate order will be entered.

March 31 , 2010

Wilmington, Delaware

CHIEF, UNITED STATES DISTRICT JUDGE

---

[18]The court will not discuss the issue of qualified immunity inasmuch as the defendants did not violate Riley's constitutional rights.

-26-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAMES W. RILEY,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  ) Civ. Action No. 06-001-GMS
                                         )
STANLEY TAYLOR, et al.,                  )
                                         )
          Defendants.                    )

**ORDER**

At Wilmington this 31st day of ____March____, 2010, for the reasons set forth in

the Memorandum issued this date;

    1. The State defendants' motion for summary judgment is **granted**.  (D.I. 125.)

    2. The medical defendants' motion for summary judgment is **granted**.  (D. I. 127.)

    3. The plaintiff's motion for hearing is **denied** as **moot**.  (D.I. 145.)

    4. At the close of the case, the Clerk of Court is directed to enter judgment in favor of

Stanley Taylor, Thomas Carroll, David Pierce, Christine Malaney, and Correctional Medical

Service, Inc. and against the plaintiff.

CHIEF, UNITED STATES DISTRICT JUDGE

-27-